IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EMMA E. | § | |
| | § | |
| VS. | § | CA No. _____ |
| | § | |
| AETNA LIFE INSURANCE COMPANY | § | |
| and EXXONMOBIL MEDICAL PLAN | § | |

**PLAINTIFF'S COMPLAINT**

EMMA E., Plaintiff, files this Complaint asserting causes of action in law and equity for relief against Aetna Life Insurance Company and ExxonMobil Medical Plan, Defendants.

**I.
PARTIES**

1.  Plaintiff is a resident citizen of Flower Mound, Texas. She brings this action to recover benefits for her treatment of a severe mental illness while she was a minor. Pursuant to Federal Rule 5.2, she is referenced as Emma E.

2.  Defendant, Aetna Life Insurance Company ("Aetna"), is a domestic or foreign insurance company licensed to do business and doing business in the state of Texas, and can be served with process by serving its registered agent, CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, or wherever it may be found. Magellan Healthcare ("Magellan") is the claims administrator for Aetna and the Plan and acted on behalf of them in all matters alleged herein regarding the administration, granting, payment, termination, and appeal denial of

1

Plaintiff's claim for benefits. All communications between Plaintiff and Aetna and actions taken by Aetna, as alleged herein, were by Magellan.

3. Defendant, ExxonMobil Medical Plan ("Plan"), is a domestic or foreign company licensed to do business and doing business in the state of Texas, and can be served with process by serving its registered agent, Corporation Service Co., 211 East 7th St., Austin, TX 78701-3218, or wherever it may be found.

## II.
## JURISDICTION AND VENUE

4. This action against Aetna and the Plan arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.* This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

5. Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because Defendants maintain business activity in and are in this district.

6. Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration, at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024, by certified mail return receipt requested.

## III.
## STATEMENT OF FACTS

7. Plaintiff was at all relevant times a covered beneficiary under an employee welfare benefit plan created and administered by ExxonMobil Corporation ("ExxonMobil"). Plaintiff's father, Sean, worked for ExxonMobil and was a covered

participant under the Plan. As a beneficiary, Plaintiff was entitled to health care benefits under the Plan.

8. ExxonMobil was Sean's employer and plan sponsor of the Plan.

9. Magellan Healthcare was the Claims Administrator of the Plan.

10. Aetna was the insurer or excess insurer for the Plan.

11. Plaintiff suffers from a long and tragic history of serious mental illness. In 9th grade, she began self-injurious behaviors, cutting her thighs and arms repeatedly. She missed more than 30 days of school.

12. In October 2015, Plaintiff tried to commit suicide by overdose of medication. She tried twice more in February and June 2016.

13. One day after her third suicide attempt, Plaintiff was admitted to Springwoods Adolescent Psychiatric Unit ("Springwoods") for acute inpatient hospitalization. She was discharged after a three week stay.

14. She was re-admitted to Springwoods in September 2016 for two more weeks.

15. In early October 2016, Plaintiff attempted suicide for the fourth time by ingesting more than 150 Abilify, Zoloft, and Benadryl pills. She was admitted to Cook's County Children's Hospital the same day.

16. On October 10, 2016, Plaintiff was admitted to Springwoods for the third time. She remained on an inpatient basis for two weeks.

17. Plaintiff was diagnosed with bipolar disorder in November 2016.

18. On December 2, 2016, Plaintiff ran away from home and threatened to commit suicide by jumping off a bridge. She was found by the sheriff while walking down

a busy street in only her socks. She was arrested later that night for family violence and put on probation.

19. On January 2, 2017, Plaintiff was admitted to The Center for Success and Independence ("The Center") for intermediate residential treatment. She transitioned to partial hospitalization on January 27, 2017. She was discharged from The Center on March 2, 2017. She continued with intensive outpatient treatment at The Center three days a week.

20. Plaintiff received further psychological testing and evaluation at Family Psychiatry of The Woodlands and was diagnosed with both bipolar and borderline personality disorders.

21. Sean, Plaintiff's father, filed a claim for health care coverage with Aetna. The claim was denied due to an alleged lack of medical necessity.

22. On February 10, 2017, The Center filed a Level 1 appeal to Aetna. In the appeal, The Center provided medical records and other evidence supporting its claim that Plaintiff's treatment was medically necessary.

23. Magellan denied the first level appeal four days later. However, by filing the Level 1 appeal, The Center had complied with the Plan's administrative requirements and directions provided in the Explanation of Benefits.

24. In March 2017, Plaintiff left her aunt's house in the middle of the night and was brought home inebriated to the point of blackout.

25. Later in March 2017, Plaintiff tried to commit suicide for the fifth time by jumping out of a moving car on the way to a meeting with her probation officer.

26. In April 2017, Plaintiff began to cut herself again, refused to attend school refused to take her medications, became physically violent, and received an additional citation for family violence.

27. On May 5, 2017, Plaintiff was admitted to Solacium Sunrise Residential Treatment Center ("Solacium").

28. Aetna approved coverage for residential treatment from May 5, 2017 through 24, 2017. In doing so, it relied on the Magellan Medical Necessity Criteria Guidelines ("Magellan Medical Guidelines").

29. On May 22, 2017, Solacium performed a psychiatric evaluation of Plaintiff. Plaintiff advised she was only there because "my dad wanted me to be here". It further noted that previous outpatient and intensive outpatient treatment at other facilities had not been successful.

30. Aetna then approved coverage for residential treatment from May 25, 2017 through 31, 2017.

31. On May 30, 2017, Solacium employee Jana Wienecke noted that Plaintiff's behavior "has not changed much". Plaintiff remained irritable, stressed, and anxious. Her impulsivity and emotional dysregulation were still problematic and only worsened when talking about the past.

32. The next day, Aetna approved coverage for residential treatment through June 7, 2017.

33. On June 5, 2017, a Solacium employee noted that Plaintiff still suffered from anxiety, depression, racing thoughts, and fears of abandonment. The employee advised of the need to continue the residential level of care.

34. Three days later, Magellan employee Dr. Clifton Smith reviewed some of Plaintiff's medical records. He concluded that she did not meet the guidelines for continued residential treatment. In his opinion, Plaintiff did not even qualify for partial hospitalization treatment based on his belief that she was not even taking medication.

35. On June 9, 2017, Dr. Smith held a peer to peer telephone call with a Solacium employee. The Solacium employee advised that its team was not seeing much progress in Plaintiff accepting her conditions. She was not able to voice an addiction safety plan.

36. Later that day, Aetna denied ongoing coverage for residential treatment at Solacium. In doing so, it determined that Plaintiff did not meet the 2017 Magellan Care Guidelines for Continued Residential Treatment ("Magellan Residential Guidelines").

37. Aetna paid Solacium for Plaintiff's residential treatment from May 5 through June 9, 2017.

38. Plaintiff continued with residential treatment at Solacium. On August 22, 2017, Solacium prepared an Interim Treatment Plan that would help Plaintiff overcome the identified treatment issues within 7-9 months, then reintegrate her into a safe home environment.

39. Three days later, Plaintiff lamented to a Solacium employee that "No matter how hard I try, things will fall apart".

40. On October 3, 2017, Plaintiff's ongoing difficulties with coping with her family arose once more, as she became aggressive in a family therapy session. She struggled to take a break, and the session had to be ended early as a result.

41. On November 4, 2017, Plaintiff left Solacium for a family visit.

42. The next day, the police were called after there was an aggressive physical incident involving Plaintiff.

43. Plaintiff returned to Solacium on November 5, 2017. Solacium employees reported that she seemed "down" upon her return, and she admitted that things did not go well during the family visit.

44. On November 11, 2017, Plaintiff stated in her group meeting that she would never recover from her lifetime of trauma.

45. On December 4, 2017, Plaintiff's father submitted a Level 1 appeal to Aetna for its denial of ongoing residential treatment since June 2017. In the appeal, Sean noted that Aetna identified two separate guidelines that it used in assessing the claim. It pointed out that Plaintiff had been taking medications during her treatment. It sent additional medical records, as well as records from Plaintiff's previous treatment at The Center, Family Psychiatry of The Woodlands, and Springwoods.

46. In December 2017, Magellan retained a Thomas Krajewski to review the medical records. Dr. Krajewski concluded that Plaintiff did not require 24/7 care because she was not a danger to herself or others. In coming to his conclusions, he relied on the Magellan Residential Guidelines.

47. Aetna denied the Level 1 appeal on January 4, 2018.

48. On February 1, 2018, Plaintiff's father submitted a Level 2 appeal. In the appeal, he asked why Aetna used the Magellan Residential Guidelines instead of the ExxonMobil Medically Necessary Criteria ("ExxonMobil Criteria"), which were criteria specifically developed by and for the ExxonMobil Plan. He noted that while Plaintiff had made great progress in her stay to date, she had still not completed all of the clinical objectives needed to transition her to a less intensive standard of care. She still presented very differently in the residential setting versus the home setting. She still needed 24/7 care so that her medication could be properly managed. Finally, Sean submitted a number of exhibits, including a medical record review by a Dr. Michael Connolly that criticized, among other things, Aetna's use of the wrong guidelines.

49. The Level 2 appeal contained 696 pages of additional documents. Of these, 239 pages were new medical records and 457 pages were additional historical information and evidence.

50. On February 26, 2018, Magellan employee C. Snyder noted that the Level 2 appeal had "no new information". He concluded that Plaintiff was "making the same argument as the Level 1 appeal".

51. The same day, Aetna sent a letter confirming that it would not review the Level 2 appeal. It stated that all appeals had now been exhausted.

52. Plaintiff was finally discharged from Solacium on March 30, 2018.

53. On April 18, 2018, Magellan employee C. Snyder and Kalli, Plaintiff's step-mother, held a telephone conference regarding the Level 2 appeal. Once again, C. Snyder

advised that the arguments were "the same" and that the Level 2 appeal would be denied.

54. A day later, C. Snyder noted that the Level 1 appeal used the Magellan Residential Guidelines instead of the Magellan Medical Guidelines. Magellan finally "accepted" the Level 2 appeal for review.

55. Aetna then retained a Dr. Daniel Harrop to review some of Plaintiff's medical records. Dr. Harrop concluded that the medical records from the summer of 2017 indicated Plaintiff's ongoing difficulty with controlling her emotions, but that she experienced no physical loss of control. He did not find any need for 24/7 supervision.

56. Aetna denied Plaintiff's Level 2 appeal on May 3, 2018, the day that Dr. Harrop signed his medical record review.

57. In denying Plaintiff's Level 2 appeal, Aetna relied on Dr. Harrop to review some of Plaintiff's medical records. Dr. Harrop holds himself out as a licensed physician but does not specify where he is licensed. There is no evidence that he has staff privileges at any hospitals or actually practices medicine. In fact, the only evidence available is that he does nothing but review medical records for insurance companies.

58. In 2014, Dr. Harrop decided to run for Mayor of Providence, Rhode Island. As part of his campaign, he conducted an interview with the Providence Journal. The interview probably reveals more than Dr. Harrop intended, as it is an insightful look into his personality and work habits. He keeps an upstairs home office where he reviews medical records for insurance companies. The office is sloppy, with

papers everywhere, which Dr. Harrop insists is "organized chaos". Dr. Harrop was equally as sloppy when making medical diagnoses. Just minutes after admitting that "you can't make a diagnosis without an exam", he dismissed his mayoral opponent, Buddy Cianci, as a "sociopath".

59. Dr. Harrop was found guilty of illegally evicting two Harvard undergraduates, then "blatantly committing perjury" during the legal proceedings. As if that were not enough, Dr. Harrop was involved in illegal billing practices while working at UnitedHealthcare, leading to a $66,000 find being assessed by the Department of Health. As a result, he was fired from UnitedHealthcare's subsidiary, United Behavioral Health. Given his many legal problems and propensity to lie, his opinions in this claim should be discarded.

60. Aetna's use of this medical record review, among others, reveals its underlying motive to deny Plaintiff's claim, no matter the evidence. On information and belief, Aetna selected these medical record reviewers to review Plaintiff's claim for that very purpose. This pattern of conduct evidences a biased approach and treatment of Aetna's approach to mental health claims, including this one.

61. In May and June 2018, Plaintiff's father tried to follow up with the Plan, asking for the complaint process with Magellan and Aetna. He asked the Plan to compel Magellan and Aetna to provide the information requested. He sent an email on June 19, 2018 to follow up on his previous request. The Plan never responded.

62. On August 23, 2018, upon Aetna's request, Plaintiff's father and step-mother provided a summary of the dispute with Magellan, including their requests for information and documents. Aetna did not respond.

63. On March 14, 2019, Plaintiff submitted additional evidence in support of her claim. Among other things, she provided evidence relating to Aetna's use of biased and unqualified medical record reviewers. The additional evidence was provided pursuant to Fifth Circuit case authority that obligated Aetna to review the additional information. ("The administrative record consists of relevant information made available to the administrator prior to the . . . filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it".) *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). *Vega* has been repeatedly upheld by the 5th Circuit, most recently in *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018). She requested that Aetna review those records pursuant to its legal obligation and re-evaluate her claim.

64. The evidence that Plaintiff sent in March 2019 was submitted before filing this lawsuit and in a manner that gave Aetna a fair opportunity to consider it.

65. Aetna totally ignored the additional medical evidence and did not even acknowledge receiving it.

66. Having exhausted her administrative remedies, Plaintiff brings this action to recover the LTD benefits promised in the Plan and Policy.

## IV.
## CLAIMS & CAUSES OF ACTION

67. The ExxonMobil Health and Welfare Plan is governed by ERISA. 29 U.S.C. §1001, *et. seq.* ExxonMobil is the plan sponsor and Plan Administrator. Aetna is the

insurer or excess insurer for the Plan. Magellan is the Claim Administrator under the Plan for behavioral and mental health.

68. As Plan fiduciaries, Aetna and the Plan are obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the Plan. They are also obligated as fiduciaries to conduct their investigation of a claim in a fair, objective and evenhanded manner.

69. Aetna's adjustment of Plaintiff's claim was instead biased and outcome oriented. This was partly reflected by its denial of Plaintiff's claim, even after being presented with evidence that her claim was covered and that her ongoing treatment was medically necessary. It was also reflected in Aetna's unreasonable reliance on reviewers who lacked the training, education, and experience to objectively or competently review his claim. It was also reflected in Aetna's repeated use of incorrect and inappropriate guidelines for Plaintiff's medical condition or pursuant to Plan requirements.

70. Aetna's interpretation of the Plan was not legally correct. It was also contrary to a plain reading of the Plan language.

71. Aetna's interpretation of the Plan and Plan language was contrary to that of the average Plan participant and policyholder. It was contrary to the common and ordinary usage of the Plan terms. Alternatively, the Policy language upon which Aetna based its denial decision was ambiguous. The ambiguous nature of those terms requires those terms be construed against Aetna and the Plan and in favor of coverage for Plaintiff.

72. Aetna's denial was made without substantial supporting evidence. Its decision to terminate Plaintiff's claim was instead based upon rank speculation and guesswork. Aetna's denial decision was *de novo* wrong. Alternatively, it was arbitrary and capricious.

73. At all material times, Aetna acted on behalf of the Plan and in its own capacity as the Insurer and as Claims Administrator.

74. Aetna's termination of Plaintiff's claim breached the terms of the Plan. This breach was in violation of 29 U.S.C. §1132(a)(1), entitling Plaintiff to the health insurance policy benefits to which she is entitled, along with pre-judgment interest on the amounts due and unpaid, all for which Plaintiff now sues.

## V.
## STANDARD OF REVIEW

75. The default standard of review for denial of a benefit claim is *de novo.* Where the Plan or Policy confers discretion on the Claims Administrator, an abuse of discretion standard of review may apply.

76. The Plan or Policy may contain a discretionary clause or language Aetna may contend affords it discretion to determine eligibility for benefits, to interpret the Policy, and determine the facts. Aetna's denial under this standard of review, if any, was an abuse of discretion. It was arbitrary and capricious.

77. If discretion applies, the Court should afford Aetna less deference in light of its financial conflict of interest. Aetna's conflict of interest is both structural and actual. Its structural conflict results from its dual role as the adjudicator of Plaintiff's claim and as the potential payor of that claim.

78. Aetna's actual financial conflict is revealed in the policies, practices, and procedures influencing and motivating claim delays and denials for financial gain. Aetna's financial conflict is also revealed in the high return gained from the delay in payment or denial of claims.

79. Each of these grounds, on information and belief, was a motive to deny Plaintiff's claim, along with the delay in payment or denial of claims of other Aetna policyholders and claimants.

80. In light of its financial conflict, Aetna should be given little or no discretion in its claims decision.

81. Alternatively, the standard of review of this claim should be *de novo,* affording Aetna no discretion in its interpretation of the terms of the Policy and Plan or in its factual determinations. Both factual conclusions and legal determinations are reviewed *de novo* by the Court. *Ariana v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018).

82. The Plan or Policy was delivered in Texas and is subject to the laws of that jurisdiction. Accordingly, Texas law applies under the ERISA savings clause. Texas has banned the use of discretionary clauses in insurance policies issued in this state. TEX. INS. CODE §1701.062; 28 Tex. ADMIN. CODE §3.1202. Accordingly, review of Plaintiff's claim and Aetna's claims handling conduct, both in its interpretation of terms of the Policy and the Plan, and in its determination of the facts, should be *de novo.*

## VI.
## REQUEST FOR PREJUDGMENT INTEREST & AN ACCOUNTING

83. Plaintiff requests, in addition to the amount of benefits withheld, prejudgment interest on any such award. She is entitled to prejudgment interest as additional compensation, and pursuant to Texas Insurance Code Texas Insurance Code, Sec. 1103.104, or on principles of equity.

84. The Plan and Policy do not contain a rate of interest payable on the benefit amount wrongfully withheld. Resort must be had to Sec. 1103.104(c) of the Texas Insurance Code. Plaintiff thus requests an accounting in order to determine the amount earned on the funds that should have rightfully been paid to her, and in accordance with Insurance Code Sec. 1103.104(c).

## VII.
## CLAIM FOR ATTORNEYS FEES & COSTS

85. Plaintiff seeks an award of her reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits. She is entitled to recover those fees, together with her costs of court, pursuant to 29 U.S.C. §1132(g).

## VIII.
## PRAYER

Emma E., Plaintiff, respectfully prays that upon trial of this matter or other final disposition, this Court find in her favor and against Defendants, and issue judgment against Defendant as follows:

    A. That Defendants pay to Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon and as allowed by law and equitable principles;

    B. That Defendants pay all reasonable attorney's fees incurred and to be incurred by Plaintiff in obtaining the relief sought herein, along with the costs associated with the prosecution of this matter; and

C.  All such other relief, whether at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

By:_____
Amar Raval, TBA #24046682
S.D. No. 619209
Berg Plummer Johnson & Raval LLP
3700 Buffalo Speedway, Suite 1150
Houston, TX 77098
(713) 526-0200
(832) 615-2665 (Fax)
araval@bergplummer.com

ATTORNEYS FOR PLAINTIFF