IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EMMA E., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-19-1490 |
| | § | |
| EXXON MOBIL MEDICAL PLAN and | § | |
| MAGELLAN HEALTHCARE, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending and referred by the District Judge in this ERISA benefits case is Plaintiff's Motion for Summary Judgment (Document No. 45), and Defendants' Cross Motion for Summary Judgment (Document No. 48). Having considered the cross motions for summary judgment, the underlying record, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Defendants' Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.

**I.  Background**

This is an ERISA benefits case, in which Plaintiff, Emma E. ("Emma"), alleges that Defendants wrongfully denied her claim for inpatient psychiatric treatment benefits. According to Plaintiff, she was a beneficiary as a minor child of an employee of ExxonMobil Corporation, who was entitled to benefits under ExxonMobil's ERISA plan. She attempted suicide several times in 2016, and was admitted to psychiatric facilities several times during 2016 (two weeks in June; two weeks in September; two weeks in October). In January 2017, she was admitted to The Center for Success and Independence for residential treatment; she transitioned to partial hospitalization in late

January; and she was discharged on March 2, 2017. None of the foregoing treatment is at issue in this case.

In early May 2017, Emma was admitted to Solacium Sunrise Residential Treatment Center ("Sunrise") Defendant Magellan Healthcare, Inc. ("Magellan"), the claims administrator for the Plan, approved coverage and paid for Emma's residential treatment at Sunrise from May 5, 2017 through June 8, 2017. Magellan denied coverage for residential treatment at Sunrise thereafter. Emma was discharged from Sunrise on March 30, 2018. In this case, Emma complains about the decision to deny coverage under the ERISA plan for her psychiatric treatment at Sunrise from June 9, 2017 to March 30, 2018.

In her Complaint, Emma sets forth the procedural history associated with her claim for benefits and the administrative appeals of the denial of those claims. There is no dispute that Emma exhausted her administrative remedies, having filed both a mandatory (first level) and a voluntary (second level) appeal of the denial. Emma asserts in this case that the denial of her claim for residential psychiatric treatment benefits for the time period between June 9, 2017 and March 30, 2018 was based on a legally incorrect interpretation of the Plan, and that the benefits decision was arbitrary and capricious. Emma seeks, pursuant to 29 U.S.C. § 1132(a)(1), benefits for her residential psychiatric treatment at Sunrise from June 9, 2017 to March 30, 2018.

Both sides have filed Motions for Summary Judgment (Document Nos. 45 & 48). Emma maintains in her Motion for Summary Judgment that the Plan "abused its discretion in terminating coverage for [her] residential treatment;" "abused its discretion [by relying on] discredited treatment guidelines;" and "abused its discretion when it relied on biased and unqualified medical record reviewers who misrepresented the facts of [her] medical treatment." Plaintiff's Motion for Summary

2

Judgment at 1 (Document No. 45 at 4). Defendants (ExxonMobil Medical Plan and Magellan Healthcare, Inc.) maintain, in contrast, that there was no abuse of discretion, and that this civil action was untimely filed (more than a year after the administrative mandatory appeal was decided). The motions are fully briefed and the parties agree that this case can and should be decided on the motions and the underlying record.

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). This summary judgment standard applies in ERISA cases such as this, *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014), *but see Koch v. Metropolitan Life Ins. Co.*, Civil Action No. 7:18-cv-00154-O, 2019 WL 6329383 *4 (N.D. Tex. Nov. 26, 2019) (finding that *a de novo* review of the record should not be made in the context a motion for summary judgment where there are underlying disputed issues of fact), even though it is for the Court to determine, in an appeal-like review, whether benefits were properly denied. That appeal-like review is conducted *de novo* unless the ERISA plan gives valid and lawful discretionary authority to the plan administrator to decide claims, in which case the review is for abuse of discretion. *Ariana M v. Humana Health Plan of Texas, Inc.,* 884 F.3d 246 (5th Cir. 2018)

When the review is *de novo*, the court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing" an entitlement to benefits. *Pike v. Hartford Life & Accident Ins. Co.*, 368 F.Supp.3d 1018, 1030 (E.D. Tex. 2019). When the review is for abuse of discretion, the court must determine whether there is

substantial evidence to support the decision and whether the decision is arbitrary and capricious. *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) ("A plan administrator abuses its discretion where the decision is not 'based on evidence, even if disputable, that clearly supports the basis for its denial.'").

Here, both sides argue their respective positions based on an abuse of discretion standard. While there is some uncertainty about that standard given the Fifth Circuit's decision in *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018), because neither side has raised the issue, the undersigned will review the record and the benefits decision at issue under that abuse of discretion standard.[1]

**III. Discussion**

Emma argues that there was an abuse of discretion in three respects: (1) the ultimate benefits decision; (2) the reliance on "discredited treatment guidelines"; and (3) the reliance on biased and unqualified medical records reviewers. Defendants argue that there was no abuse of discretion, and that Emma waited too long to file this lawsuit, and that it is barred by the limitations period contained in the ERISA plan. The limitations issue is relatively straight-forward and will be addressed first.

---

[1] To the extent a *de novo* review standard could be applied, Emma has, by failing to raise the issue, waived it. *See Rittinger v. Healthy All. Life Ins. Co.*, 914 F.3d 952, 955 (5th Cir. 2019) ("[f]ailure to raise an argument before the district court waives that argument") (quoting *Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011)).

    **A.**     **Limitations**

There is no statutory limitations provision in ERISA that governs the time for filing denial of benefits claims in federal court.  Instead, limitations periods for denial of benefit claims are contained in the ERISA plans themselves, and are viewed as contractual limitations periods. *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2015).

Here, the ERISA plan provides, in pertinent part as follows, for the administrative review of denied benefit claims, as well as the subsequent judicial review of such claims under 29 U.S.C. § 1132:

> **Denied Claims**
> If your claim for benefits is denied completely or partially, you, your beneficiary, or designated representative will receive written notice of the decision.  The notice will describe:
> - The specific reason(s) for the denial.
> - Any additional information or material necessary to perfect the claim and an explanation of why such information or material is necessary.
> - The process for requesting an appeal.
>
>       \* \* \*
>
> **Filing an Mandatory Appeal**
> If your claim is denied, you, your beneficiary, or your designated representative may appeal the decision to the appropriate claims fiduciary.  Your written appeal should include the reasons why you believe the benefit should be paid and information that supports, or is relevant to, your claim (written comments, documents, records, etc). Your written appeal may also include a request for reasonable access to, and copies of, all documents, records and other information relevant to your claim. . . . You must submit your written appeal within 180 days from the date of the denial notice.
>
> The review will take into account all comments, documents, records or other information submitted relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. . . .
>
>       \* \* \*
>
> If your appeal is denied, you will receive written notice of the decision.  The notice will set forth:

- The specific reason(s) for the denial and the Plan provisions upon which the denial is based.
- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim.
- A statement of the voluntary appeal procedure and your right to obtain information about such procedure or a description of the voluntary appeal procedure.
- A statement of your right to being an action under section 502(a) of the Employee Retirement Income Security Act (ERISA).

**Statute of Limitations**
After you have received the response to the mandatory appeal, you may bring an action under section 502(a) of ERISA. Such action must be filed within one year of the date on which your mandatory appeal was decided. The statute of limitations or other defense based on timeliness is suspended during the time that a voluntary appeal is pending.

Exxon 000068.

Here, the record shows that on June 9, 2017, Magellan denied the claim for continued residential psychiatric treatment for Emma at Sunrise. Exxon 335-337. Emma's father filed a mandatory appeal of that decision on December 4, 2017, Exxon 0298-328, admittedly within the 180 days required by the terms of the plan for filing such an administrative appeal. On January 4, 2018, Magellan denied that appeal. Exxon 0283-286. Emma's father then, on February 1, 2018, filed a voluntary administrative appeal. Exxon 2067-2122. On May 3, 2018, Magellan denied the voluntary appeal. Exxon 2054-2056. This suit was then filed on April 23, 2019.

Magellan is technically correct that this action was not filed within the one year limitations period contained in the plan. The mandatory appeal was denied on January 4, 2018, which began the one year limitations period. The limitations period was suspended between February 1, 2018 and May 3, 2018, while the voluntary appeal was pending, but that period of suspension does not render this action timely filed within the one year limitations period. The one year limitations period

6

began on January 4, 2018, and ran for twenty-seven (27) days before it was suspended based on the pendency of the voluntary appeal. The limitations period then ran again from May 3, 2018, when the voluntary appeal was denied, until April 23, 2019, when this case was filed, a period of 354 days. When the time before the voluntary appeal was filed (27 days) is added to the time after the voluntary appeal was denied (354 days), it is without question that the one year limitations period expired prior to the filing of this case on April 23, 2019.

Emma does not directly address the limitations argument in her Reply Brief, but argues only that it is a "red herring." She also makes a passing reference to the voluntary appeal denial letter, in which she claims she was advised that she had a year to file suit. Without arguing or advocating for any estoppel-based argument for extending the limitations period based on the contents of that voluntary appeal denial letter, Emma merely states that the authority relied on by Defendants is "inapposite" and that "[n]o more time need be wasted on the statute of limitations argument." Reply (Document No. 53) at 2.

While not specifically raised by Emma in her responsive briefing, equitable estoppel could allow for an extension of the limitations period given the contents of the May 3, 2018 denial letter. *See Mello v. Sara Lee Corp.*, 431 F.3d 440, 444–45 (5th Cir. 2005) ("We now join other circuits in explicitly adopting ERISA-estoppel as a cognizable theory. To establish an ERISA-estoppel claim, the plaintiff must establish: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances."). In that May 3, 2018 letter, in which Magellan addressed Emma's arguments that she met the "Continued Stay" criteria in Magellan's guidelines, Magellan advised Emma that she could file "suit in a Federal court" and that such a lawsuit "must be brought within one year of the date on which an appeal was denied." Exxon 2055.

7

The letter did not distinguish between the denial of a mandatory (first level) appeal, or the denial of a voluntary (second level) appeal. All the letter states is that Emma had one year from the date "an" appeal was denied to file suit. Such language can be construed as having advised Emma that she had until May 3, 2019, one year from the date her voluntary appeal was denied, to file an action under § 1132(a). Based on liberally construed estoppel principles, this case should therefore not be dismissed on limitations grounds. Consequently, it must be determined whether Defendants abused their discretion in connection with the benefits decision at issue.

### B.     Benefits Decision

The benefits determination at issue in this case starts and ends with the terms of the plan, and the definition of medical necessity in that part of the plan which relates to "Mental Health and Chemical Dependency Care."[2] As is made clear in the Plan, "mental health and chemical dependency care [is provided] through a nationwide mental health PPO (MHPPO) administered by Magellan Behavioral Health. . . . Magellan Behavioral Health provides pre-certification of both inpatient and outpatient treatment, provider referral, ongoing consultation and review, and case management for mental health and chemical dependency treatment". Exxon 34. In addition, with respect to "medical necessity," the Plan provides that "Magellan Behavioral Health may use its guidelines in an initial determination of whether a mental health service or supply is medically necessary." Further, the Plan provides, "[w]hen determining whether a service or supply is

---

[2] Emma argues in her Motion for Summary Judgment that the general "medical necessity" definition in the Plan applies, and that Magellan's medical necessity guidelines do not apply because they were not incorporated into the Plan. Both arguments fail. As set forth above, the Plan itself makes reference to Magellan guidelines and their use for determining medical necessity in a mental health treatment context. Emma also makes reference in her Motion for Summary Judgment to Magellan's Guidelines for substance abuse, Exxon 4721, which are not applicable in this case.

8

medically necessary, the care manager's published medical necessity criteria will be determinative for mental health network services and out of network inpatient mental health services. When determining whether a service or supply is medically necessary, the Claims Processor's clinical policy bulletins will be determinative for all other mental health services." Exxon 147 (underlining in original). Thus, for purposes of mental health care, which is at issue herein, what is considered "medically necessary" under the Plan is to be determined by Magellan by reference to Magellan's "guidelines" and/or "policy bulletins." Emma's argument that the "general" definition in the Plan of medical necessity[3] should apply is simply not supported by the terms of the Plan, which distinguish between medical care and mental health and chemical dependency care.

As for the determination at issue, Magellan wrote in the June 9, 2017 letter denying Emma's claim/request for continued residential mental health care benefits that, based on a review by a board-certified psychiatrist of the clinical/medical information provided to it, "Residential treatment is not medically necessary based on 2017 Magellan Care Guidelines for Residential Treatment, Psychiatric, Child and Adolescent requirement" not having been met. Magellan further wrote that it could not authorize residential treatment as of June 9, 2017, because Emma: (1) did "not currently have thoughts of taking [her] own or someone else's life;" (2) was "not hearing or seeing things

---

[3] Medical Necessity is defined by the Plan "In General" as "a service or supply, which is a covered expense under section 2, which is,
   (1)   legal;
   (2)   ordered by a physician;
   (3)   reasonably required for the treatment or management of the condition for which it is ordered; and
   (4)   commonly and customarily prescribed by the United States medical community as treatment or management of the condition for which it is ordered.
Exxon 0147.

9

which are not real or present;" (3) was "not taking any medications;" (4) was "not reporting any medication related side effects;" (5) was "able to do appropriate self-care;" (6) had her "father as [her] identified support;" (7) was "not considered an imminent risk to [herself] or others at the time." Exxon 335. Magellan also determined that while Emma did not meet the criteria for residential treatment, she did "meet 2017 Magellan Care Guidelines for Intensive Outpatient Program Behavioral Health Level of Care, Child or Adolescent." Exxon 335

In a sixteen page letter dated December 4, 2017, Emma's father appealed that benefits decision. Exxon 298-328. The letter first alleged that a full and fair review of the claim had not been done by Magellan. Then, the letter provided a chronology of Emma's behavioral and treatment history, as well as additional, personal information about Emma's history from her family's perspective, including text messages between Emma and both her mother and father before her May 2017 admission to Sunrise. Much of the information contained in the December 7, 2017, appeal letter from Emma's father is not in the records from Sunrise.

On January 4, 2018, Magellan denied the appeal. The denial letter states:

Magellan has completed the first level clinical appeal related to residential treatment for the above-named member with the above-named facility for dates of service June 9, 2017 and going forward. The Magellan case record and the facility's record submitted have been thoroughly reviewed by the Physician Advisor, a board-certified psychiatrist, Thomas Krajewski, MD.

The Physician Advisor determined that residential treatment is not medically necessary based on the 2017 Magellan Care Guidelines due to the following reason(s):

> The patient presented with a history of self-injurious behavior, suicide attempts and aggressive behavior. Magellan care guidelines for residential behavioral health care of a child or adolescent treatment have not been met after June 8, 2017. The patient's symptoms do not appear to require 24/7 care as she was able to take care of her physical needs. She was not at risk of being dangerous to

> herself or others. The patient does have services in the area where she lives that would help her get better. The current symptoms would be safely treated at a less restrictive level of care.
>
> Therefore, Magellan is unable to authorize residential treatment as of June 9, 2017. Our original decision is upheld.

Exxon 283. Attached to that denial letter and provided to Emma was Dr. Krajewski's two-page medical necessity review. Exxon 290-291.

A second, voluntary appeal was sent by letter dated February 1, 2018. Exxon 2067-2122. In that 56- page letter, Emma's father made reference to Magellan's 2017 Care Guidelines and detailed the residential progress notes from Sunrise which would support the "Continued Stay" criteria in Magellan's 2017 Care Guidelines. Also included in the letter was a December 2017 assessment by Tiffany Barlow, a licensed clinical social worker (LCSW), which explained Emma's need for 24-hour supervision due to her "volatile moods and risky behavior." Exxon 2110-2112. Magellan, on May 3, 2018, denied the second appeal. In so doing, Magellan wrote:

> Magellan has completed the second level clinical appeal related to residential treatment for the above-named member with the above-named facility for dates of service June 9, 2017 and going forward. The Magellan case record and the facility's record submitted have been thoroughly reviewed by the Physician Advisor, a board-certified psychiatrist, Daniel Harrop, MD.
>
> The Physician Advisor determined that residential treatment is not medically necessary based on 2017 Magellan Healthcare, Inc. Medical Necessity Criteria Guidelines due to the following reason(s):
>
>> Based on the medical information available, no days can be recommended, due to no current evidence of need for 24 hour [care] to provide appropriate monitoring of the patient's condition, and there is no intent at imminent dangerousness requiring residential level care. The current outpatient living environment would provide the support needed to access appropriate therapeutic services necessary for recovery. A lower level of care will suffice for ongoing treatment. The problems that caused the patient's admission are no longer present to a degree that would require 24-hour medical monitoring & psychiatric intervention. The patient has shown

11

>continued progress in treatment to a point that allows him/her to be transitioned to a less restrictive level of care. The patient is now able to cooperate with treatment, has a safe home environment and can reliably seek help outside program hours.

>Therefore, Magellan is unable to authorize residential treatment as of June 9, 2017. Our original decision is upheld.

>The following criteria were not met: 2017 Magellan Medical Necessity Criteria for Residential Treatment, Psychiatric, Child and Adolescent III. A, D.

Exxon 2054-2055.

Notwithstanding the progress notes from Sunrise relied upon by Emma E's father for the second level appeal or the opinion of Tiffany Barlow, Magellan did not abuse its discretion in denying residential treatment benefits for Emma from June 9, 2017, forward. The Magellan Guidelines for "Residential Treatment, Psychiatric, Child and Adolescent," have three parts: two with criteria for "admission" (I. "Admission - Severity of Need," and II. "Admission - Intensity of Quality of Service") and the other with criteria for "continued stay" (III. "Continued Stay"). Here, because Magellan approved of Emma's admission at Sunrise in May 2017, and approved of residential treatment benefits through June 8, 2017, it is Magellan's application and assessment of the "Continued Stay" criteria in Magellan's Guidelines, Residential Treatment, Psychiatric, Child and Adolescent III that is subject to review for abuse of discretion.

The multi-pronged "Continued Stay" criteria requires:

Criteria A, B, C, D, E, F and G must be met to satisfy the criteria for continued stay.

A. Despite reasonable therapeutic efforts, clinical evidence indicates at least one of the following:
1) the persistence of problems that caused the admission to a degree that continues to meet the admission criteria (both severity of need and intensity of service needs), *or*
2) the emergence of additional problems that meet the admission criteria (both severity of need and intensity of service needs), *or*

        3)      that disposition planning and/or attempts at therapeutic re-entry into the community have resulted in, or would result in exacerbation of the psychiatric illness to the degree that would necessitate continued residential treatment. Subjective opinions without objective clinical information or evidence are NOT sufficient to meet severity of need based on justifying the expectation that there would be a decompensation.

B.      There is evidence of objective, measurable, and time-limited therapeutic clinical goals that must be met before the client can return to a new or previous living situation. There is evidence that attempts are being made to secure timely access to treatment resources and housing in anticipation of discharge, with alternative housing contingency plans also be addressed.

C.      There is evidence that the treatment plan is focused on alleviation of psychiatric symptoms and precipitating psychosocial stressors that are interfering with the patient's ability to return to a less-intensive level of care.

D.      The current or revised treatment plan can be reasonably expected to bring about significant improvement in the problems meeting the criterion IIIA, and this is documented in weekly progress notes, written and signed by the provider.

E.      There is evidence of intensive family and/or support system involvement occurring at least once per week, unless there is an identified, valid reason why it is not clinically appropriate or feasible.

F.      A discharge plan is formulated that is directly linked to the behaviors and/or symptoms that resulted in admission, and begins to identify appropriate post-residential treatment resources.

G.      All appropriate elements in Admission-Intensity and Quality of Service Criteria are applied as related to assessment and treatment, if clinically relevant and appropriate.

Exxon 2192-2193. The May 3, 2018 letter from Magellan denying Emma's second level appeal states that continued residential treatment benefits were denied based on the absence of Criteria A and D. That determination is supported by the record evidence, and is therefore not an abuse of discretion. *See Love v. Dell, Inc.*, 551 F.3d 333, 336 (5th Cir. 2008) ("Review for abuse of discretion

. . . equates to a ruling on whether the administrator's determination was 'arbitrary and capricious.' We affirm the administrator's findings if they are supported by 'substantial evidence,' which has been defined as 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'").

As of June 8, 2017, Emma was connecting with her peers, was in a generally positive mood, and had not had any complications with interventions related to her "pushing away" behavior. Exxon 1070-1073. There was no mention, at all, of any suicidal or self-harming thoughts or any aggressive behavior. Exxon 1070-1073. In fact, the progress notes from the early part of June indicate Emma had made progress expressing her feelings, was working on effectively communicating, and was beginning to connect with her peers, Exxon 1074, 1075, 1077, 108, 1087, 1088. While Emma still exhibited some apprehension, Exxon 1083, her mood was generally improved, and again, there are no treatment notes during that time period of any suicidal or self-harming thoughts or aggressive behavior. Those Sunrise progress notes do not evidence "the persistence of problems that caused the admission to a degree that continues to meet the admission criteria" (Criteria III. A. 1), or "the emergence of additional problems that meet the admission criteria" (Criteria III. A. 2). That leaves Criteria A, subpart 3, which requires evidence "that disposition planning and/or attempts at therapeutic re-entry into the community have resulted in, or would result in exacerbation of the psychiatric illness to the degree that would necessitate continued residential treatment." The only record evidence that relates to Criteria A, subpart 3 is the opinion of Tiffany Barlow.[4] But subpart 3 itself makes it clear that an opinion like that of Barlow is not

---

[4] According to Barlow,

Emma suffers from a complex combination of mental disorders that have

14

enough: "Subjective opinions without objective clinical information or evidence are NOT sufficient to meet severity of need based on justifying the expectation that there would be a decompensation." As for the record evidence of an altercation between Emma and her father in November 2017 during a home visit, that altercation could be viewed as Emma's response to an attempted re-entry into the community, but the record evidence does not support a conclusion that the unsuccessful home visit *exacerbated* Emma's psychiatric illness. Instead, the record evidence reveals that the November 4, 2017 home visit was unsuccessful, with Emma getting into a near-physical fight with her father, Exxon 413-416, but following that visit, Emma participated more in group and individual therapy, and three weeks later, at an extended home visit, she did well and returned to Sunrise more engaged, and ready to work on a transition plan for a return home. Exxon 4138-4172. Magellan's determination that Criteria A had not been met is supported by the record evidence, and is, consequently, a determination that is neither arbitrary nor capricious. *See Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246-47 (5th Cir. 2009) ("A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence.") (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)).

As for criteria D, it is clearly not met on this record. It was not until August 22, 2017 that

---

repeatedly caused her to engage in behavior that presents a serious threat to her health and indeed to her life. Emma is not in a stable place to return because she still shows many extreme behaviors consistent with her diagnosis. Emma is continually reactive, unable to display genuine expression of emotion, continued feelings of "emotional numbness:, and a significant discomfort and avoidance within relationships.

Exxon 2111.

there was any mention in the Sunrise progress notes of a discernable current or revised treatment plan. Exxon 735 ("Sunrise Interim Treatment Plan"). That means that there is nothing in the progress notes from the date of Emma's admission in early May, through early June, that could be construed as a plan to address Emma's verbal and physical aggression, her suicidal thoughts and/or self-harming, or her depression and anxiety, the conditions upon which her admission to Sunrise was based. Exxon 1234-1235; 4570-4576. Indeed, the record evidence shows that by June 8, 2017, those conditions were either not present (suicidal thoughts, self-harming and aggression), or not present to the extent they were upon her admission (anxiety and depression). As such, Magellan's determination that Criteria D was not met is supported by the record evidence and is neither arbitrary nor capricious.

As for Emma's arguments that Magellan abused its discretion by using discredited "Guidelines" and relying on biased and unqualified medical record reviewers, neither argument provides a basis for a determination that Magellan abused its discretion relative to the benefits decision at issue. First, the Magellan Guidelines at issue have not been rejected by any Court in this Circuit. Nor is there any evidence is this case that the Guidelines are not based on generally accepted medical/psychiatric standards. Indeed, the Guidelines themselves make reference to numerous scholarly sources for informational support on child and adolescent issues in general, Exxon 2289-2290, Child and Adolescent Psychiatric Hospitalization, Exxon 2301-2302, medical necessity, Exxon 2304, and residential treatment, Exxon 2307-2308, 2309-2310, 2311. The opinion of Dr. Michael Connolly, submitted by Emma's father during the appeal proceedings, criticizing

16

Magellan's Guidelines for adolescent residential treatment, Exxon 4484-4485[5], is nothing more than a broad opinion about any guidelines that limit adolescent residential treatment to "a few days or weeks." It is not an opinion that invalidates the Magellan Guidelines or could in any way render them inapplicable in this case. Moreover, the case cited by Emma for the proposition that Magellan's Guidelines are inherently invalid, *Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *1 (N.D. Cal. Mar. 5, 2019), has not been shown to have any applicability here. In *Wit*, the main issue to be decided was whether *United Behavioral Health's* Coverage Determination Guidelines – not Magellan's – comported with the requirements of several ERISA plans and/or state law. Emma did not raise such an issue in this case and has not alleged in any pleading that the Magellan Guidelines at issue herein do not comport with the requirements of the Plan and/or Texas law. As for Emma's complaints about the three physicians who reviewed her records and whose opinions Magellan relied upon in denying her claim for benefits, Emma has not pointed to any clear evidence in the record that was not considered by them and which would have led to a different conclusion. In addition, nowhere is there evidence that any of the reviewers (Drs.

---

[5] Dr. Connolly states in his letter:

> The criteria being utilized by the health insurer under this patient's health benefit plan purports to cover only "short term residential treatment." The reference to "short term" in the criteria should not be misinterpreted. The average length of stay in a residential treatment setting for adolescents in this country is from seven to ten months according to the federal government's Substance Abuse and Mental Health Services Administration ("SAMHSA"). Utilizing language that limits coverage for residential treatment for adolescents to a few days or weeks rather than the average length of stay as identified by SAMHSA and other independent sources violates generally accepted standards of practice in connection with treatment for mental health and substance abuse.

Exxon 4484-4485.

Smith, Krajewski and Harrop) had any bias against Emma or mental health claimants in general, and nowhere is there evidence that any of the reviewers misapplied Magellan's Guidelines in a manner designed to deny mental health claims. Moreover, two of the reviewers (Krajewski and Harrop) were independent, third party reviewers, whose opinions are generally viewed as providing valid, independent evidentiary bases for a benefits determination. *Ariana M. v. Humana Health Plan of Texas, Inc.*, No. CV H-14-3206, 2018 WL 4384162, at *16 (S.D. Tex. Sept. 14, 2018) (on remand), *aff'd*, 792 F. App'x 287 (5th Cir. 2019).

In all, the record evidence supports Magellan's determination that residential psychiatric treatment was not medically necessary for Emma under the "2017 Magellan Care Guidelines for Residential Treatment, Psychiatric, Child and Adolescent," for the period from June 9, 2017 forward. That record evidence defeats Emma's § 1132(a) claim for benefits under an abuse of discretion standard, and warrants summary judgment in Defendants' favor.

## IV.   Conclusion and Recommendation

Based on the foregoing and the conclusion that there is no abuse of discretion on the record before the Court, the Magistrate Judge

RECOMMENDS that Defendants' Motion for Summary Judgment (Document No. 48) be GRANTED, and Plaintiff's Motion for Summary Judgment (Document No. 45) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b). Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.

*Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 8th day of February, 2021.

Frances H. Stacy
United States Magistrate Judge